# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| WHITLEY KLINGER, | ) |
| | ) |
| *Plaintiff,* | ) 15-CV-1609 |
| | ) |
| v. | ) Thomas M. Durkin |
| | ) |
| CITY OF CHICAGO; MAYASOL LLC, d/b/a | ) |
| MCDONALD'S; CHICAGO POLICE OFFICER | ) |
| MAAS (Star # 5237); CHICAGO POLICE | ) |
| DETECTIVE JOHN E.CALLAGHAN | ) |
| (Star # 20933); COUNTY OF WILL; | ) |
| SHERIFF OF WILL COUNTY PAUL KAUPAS; | ) |
| and WILL COUNTY SHERIFF'S DEPUTY | ) |
| MATTHEW GRIEBEL (ID # 01-913), | ) |
| | ) |
| *Defendants.* | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff brought this action under 42 U.S.C. § 1983 seeking recovery for alleged violations of her constitutional rights. All but one of the defendants has filed a motion to dismiss.[1] Defendants' motions will be granted in part and denied in part as set forth below.

### LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the

---

[1] Defendant Mayasol LLC, d/b/a McDonald's, has not filed a motion to dismiss.

pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

## BACKGROUND

The facts in this section are taken from the allegations in the First Amended Complaint (accepted as true for purposes of Defendants' motions) as well as other filings in this case and documents attached by the parties to their briefs. Matters outside the complaint are included for background purposes only. The Court's ruling on Defendants' motions to dismiss is based only on Plaintiff's allegations and

matters outside the complaint referenced by Plaintiff that are not contrary to any of the allegations in the complaint.[2]

At 1:30 a.m. on March 16, 2014, Plaintiff was in the women's restroom at a McDonald's restaurant located in the City of Chicago at 3620 North Clark, when two unknown men entered. Plaintiff asked them to leave, and they did. When Plaintiff exited the restroom, the same two men were waiting outside and made improper comments to Plaintiff. Tyler Nunez was present and intervened. He exchanged words with the two men and then began to move toward the exit with Plaintiff. As Nunez and Plaintiff were trying to leave, other men approached and impeded their progress. One of those men shoved Nunez hard from behind. The St. Patrick's Day parade in Chicago had taken place that day, and the man was wearing a kilt and carrying bagpipes. He also had what appeared to be a police star around his neck. Nunez told the man he did not want to fight. The man told Nunez "You're coming with me," put Nunez in a headlock, and dragged him outside. The man and another unknown assailant knocked Nunez onto the ground and began beating him about the face and body. Plaintiff attempted to stop the men from beating Nunez. The man wearing the kilt punched Plaintiff in the face with a closed fist. Plaintiff, who had her arm in a sling from a previous injury, was thrown to the ground by the other assailant. At this point, Plaintiff flagged down Defendant

---

[2] *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n. 1 (7th Cir. 2012) ("If a moving party relies on additional materials, the motion must be converted to one for summary judgment under Rule 56. A plaintiff, however, has much more flexibility in opposing a Rule 12(b)(6) motion . . . . [She] may elaborate on h[er] factual allegations so long as the new elaborations are consistent with the pleadings.") (internal quotation marks and citations omitted).

Officer Maas in a nearby marked Chicago police car. Plaintiff explained to Officer Maas what had happened. Officer Maas spoke to the man in the kilt, and told him "to leave the scene by getting on the party bus, presumably the vehicle he arrived in." R. 62 at 5 (¶ 29). The man took his bagpipes, got on the bus, and was not seen again. The other assailant also disappeared.

Plaintiff and Nunez were taken to the hospital, where they were treated for their injuries. Plaintiff later went to the City of Chicago 19th District Police Station and met with Defendant Detective Callaghan to make a formal complaint arising out of the incident. Plaintiff's attempt to file a complaint was "met with apathy and resistance." *Id.* at 5 (¶ 32). When Plaintiff pressed Detective Callaghan further about investigating her charges, Callaghan threatened to charge Plaintiff with a crime if she did not drop the matter. *Id.* at 6 (¶ 34).

A police report filed by Officer Maas after the incident identifies Plaintiff as the victim of a simple battery. *See, e.g.,* R. 57-1 at 2. The report also identifies a "witness," named "P.O. Sean O'Dublan, #1913, Beat: 3100, Chicago, IL." *Id.* The suspect who hit Plaintiff is listed as "unknown" and is said to have fled the scene on foot. *See* R. 57-1 at 4. The report goes on to say that an unidentified officer (referenced as "Beat 1963") "related to" Officer Maas "that off[-]duty Officer Sean O'Dublan #1913 observed" Plaintiff and the unknown offender "engaged in an altercation." *Id.* The same unidentified officer (Beat 1963) also related to Maas that "#1913 P.O. Sean O'Dublin (Witness) did not relate[ ] any other information regarding the incident." *Id.* A later report filed by Detective Callaghan states that

4

"P.O. Maas, who was assigned to the paper on the above case, in an attempt to locate the named witness, P.O. Sean O'Dublin[,] . . . stated, in summary, that he never interviewed the listed witness O'Dublin and was given the name and information by a supervisor on the scene." R. 57-2 at 17.

Approximately a month after the incident, Plaintiff called the Independent Police Review Authority (IPRA) to register a complaint, alleging that she had been struck by an unidentified, off-duty Chicago police officer. *See* R. 57-3 at 2. Approximately ten months later, Plaintiff filed this lawsuit naming as defendants the City of Chicago and Chicago Police Officer Maas and Chicago Police Detective Callaghan (collectively the "City of Chicago Defendants"). Plaintiff also sued the McDonald's restaurant where the incident took place (non-moving defendant Mayasol LLC), and another individual identified as "Chicago Police Officer Sean O'Dublan." Plaintiff further alleged that, "[u]pon information and belief, Defendant Officer Maas failed to obtain Defendant Officer O'Dublan's correct name, star number, or contact information, and wrote fictitious information into the police report." R. 1 at 5 (¶ 30).

Approximately six months after she filed the original complaint, Plaintiff initiated discovery in an attempt to identify her alleged assailant who she understood was most likely a Chicago police officer with the fictitious name of "O'Dublan."[3] Plaintiff served the City of Chicago Defendants with written discovery

---

[3] Plaintiff maintains that she was told on the evening in question that the person who assaulted her was a Chicago police officer named "Sean O'Dublan, Star # 1913," and that when she went to the police department to follow up, she was

requests, and also sent subpoenas to the Naperville Police Department, the Elmhurst Police Department, and the Emerald Society.[4] *See* R. 28 at 1-2. Approximately two months later, the parties appeared in court on a motion to compel filed by Plaintiff against the City of Chicago Defendants. Plaintiff sought responses to her written discovery requests, which were more than thirty days past due. Plaintiff argued that the City of Chicago Defendants' failure to timely respond to her discovery requests was impeding her ability to identify her assailant. Although she had received a response to her subpoena from the Emerald Society, that response included a long list of potential suspects, all of whom had participated

---

again given the same information. R. 55 at 4 (¶ 11). The City of Chicago Defendants dispute that Plaintiff was told that O'Dublan was the suspect who struck her, pointing to the police report as proof that O'Dublan was believed to be a witness rather than a suspect. Whether the City of Chicago Defendants were aware that O'Dublan was a suspect, not a witness as the police report states, is one of the main issues in contention with regard to Plaintiff's claims against these defendants, and therefore, for purposes of these motions to dismiss, the Court must accept as true Plaintiff's statement regarding what she was told.

[4] The Emerald Society is an organization of American police officers or fire fighters of Irish heritage. *See https://en.wikipedia.org/wiki/Emerald_Society* (last visited on February 15, 2017). Plaintiff sent subpoenas to the Emerald Society, as well as the other suburban law enforcement agencies, because she apparently knew it was possible that the officer who struck her was not a Chicago police officer. Because Plaintiff's assailant was wearing a kilt, carrying a bagpipe, and had an officer badge around his neck, she apparently suspected that he was a member of the Bagpipes and Drums of the Emerald Society of the Chicago Police Department, which had been performing in the St. Patrick's Day parade that day. The Bagpipes and Drums of the Emerald Society consists of "over one hundred . . . active and retired Law Enforcement Officers from the rank & file of Federal Agencies, State, County(s), City of Chicago, and numerous Suburban Police Departments, joined for the purpose of promoting the appreciation of piping music. To this end, the band performs at numerous parades throughout the year, highlighted by the St. Patrick's Day events in the Chicago Loop and Southside." *https://www.facebook.com/The-Bagpipes-and-Drums-of-the-Emerald-Society-Chicago-Police-Department-176166942419792/about/* (last visited on February 15, 2017).

in the St. Patrick's Day parade on the day in question and could have been wearing a kilt and an officer badge. Plaintiff claimed that she needed the written discovery from the City of Chicago Defendants before she could proceed with depositions and other discovery to determine the exact identity of the "Officer O'Dublan" who assaulted her.

The Court granted Plaintiff's motion to compel and directed the City of Chicago Defendants to respond to Plaintiff's written discovery requests on or before November 9, 2015. R. 30. Despite the Court's order, the City of Chicago Defendants did not provide their responses until November 17, 2015. *See* R. 37 at 2 (¶ 13). Moreover, the responses they ultimately served on Plaintiff contained numerous objections, leading to an exchange of letters and emails over the course of the next several months (through the end of 2015) in an attempt to resolve the parties' differences concerning the scope of discovery that would be provided by the City. Because of their disputes over the scope of written discovery, the parties postponed depositions that had been scheduled and Plaintiff sought and obtained an extension of the discovery deadline. Several more months later (through early spring 2016), on-going issues over the scope of Plaintiff's written discovery requests still had not been resolved, prompting another extension of the discovery deadline. *See* R. 34. Almost two months after that (and two weeks prior to the extended May 2016 discovery deadline), Plaintiff filed a second motion to compel and a third motion to extend the discovery deadline. *See* R. 37, R. 39.

At the hearing on Plaintiff's latest motions (held on May 26, 2016), the Court noted that it was losing patience with what seemed like unnecessary delays in discovery. The City maintained in response that Plaintiff was going about the process of identifying the unknown "Officer O'Dublan" wrong, and that her discovery requests to which the City had not yet responded were not likely to be effective in that regard. The Court extended the discovery deadline to July 12, 2016, ordered the City of Chicago to produce photographs of certain Chicago police officers, continued Plaintiff's second motion to compel, and directed the parties to work together with the mutual goal of determining the identity of "Officer O'Dublan" before the new discovery deadline. *See* R. 42 (Agreed Order dated May 27, 2016).

In late June 2016, Plaintiff filed a motion seeking leave to file the First Amended Complaint, which revealed that Plaintiff had recently been able to identify her assailant without the aid of discovery from the City of Chicago Defendants. Plaintiff learned the identity of "Officer O'Dublan" from "a third party," who told Plaintiff that an IPRA investigation conducted shortly after the incident had determined that "Chicago Police Officer Sean O'Dublan" was in reality a Will County sheriff's deputy named Matthew Griebel. *See* R. 55 at 4 (¶¶ 13-15). Plaintiff sought to amend the complaint by naming Officer Griebel in place of "Officer O'Dublan." Plaintiff contended that she had not been able to identify Defendant Griebel sooner because the City of Chicago Defendants had failed to produce the IPRA investigative report despite Plaintiff having asked for it in her written

discovery requests. *Id.* at 5 (¶¶ 16-17). Plaintiff also filed a motion for sanctions, which argued that, as of July 1, 2016 (more than 16 months after this lawsuit was filed), the City of Chicago Defendants had failed to produce any documents in response to Plaintiff's written discovery requests, had failed to identify a single witness or document in support or in defense of any claim in the case, and had failed to comply with the Court's most recent discovery order to produce certain officer photographs. R. 58 at 1. Emphasizing the City of Chicago Defendants' repeated past failures to comply with the Court's discovery orders, Plaintiff pointed out that the information she had been seeking for the past year and a half regarding Defendant Griebel's identity had been available to the City the entire time this lawsuit had been pending yet Plaintiff was only able to learn of it from a third party. *Id.* at 5.

In their opposition to Plaintiff's motion to amend the complaint, the City of Chicago Defendants admitted that an IPRA investigation indeed had been conducted and that the IPRA report of that investigation contained the information Plaintiff had learned from the third party. R. 57 at 3.[5] The City of Chicago

---

[5] The City of Chicago Defendants attached a copy of the IPRA Summary Report Digest to their response to Plaintiff's motion seeking leave to file the First Amended Complaint. The report does in fact show that the City of Chicago had at least constructive knowledge of Officer Griebel's identity all along. The report indicates that "[p]olice responded to the scene and identified the male in the kilt [who had struck Plaintiff] as 'Sean Odubagan' or 'PO Sean Odublan, #1913.'" R. 57-3 at 3. The IPRA investigator notes that the police report "identif[ies] the individual as a witness, and as wearing an Emerald Society Pipes and Drums uniform," and that he "is also described as wearing a police star around his neck." *Id.* The investigator states in the report that he showed a security video from the McDonald's where the incident took place to management within the Emerald Society, who identified the

Defendants further admitted that they had not turned over the IPRA report to Plaintiff despite her request in discovery for it. *Id.* They stated, however, that they had requested records from the IPRA but were told that none existed. The City of Chicago Defendants argued that the records they recently discovered had not been "flagged" in response to their previous request for documents from the IPRA because the investigation conducted by the IPRA "did not involve Maas or Callaghan." *Id.* The City of Chicago Defendants argued, therefore, that their failure to provide Plaintiff with discovery relating to the IPRA investigation was Plaintiff's fault because Plaintiff knew from the City's written discovery responses that it was unaware of the existence of any IPRA investigation and yet she never told the City that she knew "of an IPRA investigation that did not involve Callaghan or Maas." R. 58 at 1 (emphasis added). The City of Chicago Defendants did not explain, however, why Plaintiff should have known that the IPRA investigation she reportedly told them she believed had taken place did not reference either Detective Callaghan or Officer Maas. In addition, the City of Chicago Defendants claimed to have requested IPRA files relating not only to Detective Callaghan and Officer

_____

male in the video wearing the kilt as Will County Deputy Sheriff Matthew Griebel. *Id.* at 4. The Emerald Society provided the investigator with a photograph of Griebel via text, and explained that the Irish surname used by Griebel for official activities was "O'Dubhagain." *Id.* The IPRA investigator then contacted the Will County Sheriff's Department and spoke with the Watch Commander, who confirmed Griebel's position with that agency and provided Griebel's identification number. *Id.* The IPRA investigator concludes in the report that, because the suspect was not a Chicago police officer, the information obtained in the investigation should "be forwarded to the Will County Sheriff's Department to be pursued in the manner they deem appropriate." *Id.* at 5. The date appearing on the report digest is approximately one month after the incident took place.

Maas but to Plaintiff as well. But they could not explain why their previous request for IPRA files referencing Plaintiff by name (or even the date of the incident) did not turn up any files.[6]

On July 5, 2016, the Court granted Plaintiff's motion to file the First Amended Complaint as well as her motion for sanctions. R. 60. The Court noted at the sanctions hearing that the recently discovered IPRA report shows that investigating officers were able to identify Officer Griebel by his real name within weeks of the incident but that Plaintiff had been trying to do the same through discovery in this litigation with no success for over a year and a half.[7] The First Amended Complaint added Defendant Griebel as a defendant, and a new discovery schedule was set. Defendants then filed the present motions to dismiss, which were not fully briefed until January 18, 2017. On February 3, 2017, the Court granted another motion to extend the discovery deadline, and, on February 15, 2017, it provided the parties with an oral preview of its ruling on the motions to dismiss, stating that a written opinion would follow.

---

[6] The City of Chicago Defendants pointed out that the IPRA conducts more than 5,000 investigations per year. *See* R. 57 at 3. But they did not say how many of those 5,000 investigations were about an incident either involving an alleged victim with Plaintiff's name or one that took place on March 16, 2014. Indeed, the City of Chicago Defendants admitted that they recently discovered the missing IPRA file by searching under Plaintiff's name, which they claimed to have done before but which they also claimed did not lead to the discovery of any investigation files.

[7] A number of other recent cases in this district also have addressed difficulties § 1983 plaintiffs have experienced with obtaining relevant discovery from the City of Chicago, *see, e.g., Colyer v. City of Chicago*, 2016 WL 25710 (N.D. Ill. Jan. 1, 2016), including specifically discovery related to an IPRA investigation, *see, e.g., Young v. City of Chicago*, 2017 WL 25170 (N.D. Ill. Jan. 3, 2017).

## DISCUSSION

### A. DEPUTY SHERIFF GRIEBEL

Defendant Griebel's primary argument for dismissal of Plaintiff's claims against him is that they are barred by the statute of limitations.[8] Thus, Griebel argues that Plaintiff's § 1983 excessive force and conspiracy claims (Counts I and III), are barred by Illinois' two-year personal injury statute of limitations. *See Williams v. Lampe*, 399 F.3d 867, 870 (7th Cir. 2005). Griebel also argues that Plaintiff's state law battery and IIED claims (Counts VI and VII) are barred by the one-year statute of limitations found in the Illinois Tort Immunity Act, 745 Ill. Comp. Stat. Ann. § 10/8-101.[9]

The incident at issue took place on March 16, 2014. *See* R. 62 at 3 (¶ 10). The original complaint was filed on February 21, 2015, but it did not name Deputy Griebel as a defendant. Instead, the original complaint named "Chicago Police

---

[8] Griebel also adopts the arguments of the City of Chicago Defendants regarding whether Plaintiff's civil conspiracy and IIED claims are plausibly alleged. The Court will address those issues later in this opinion.

[9] Griebel does not address the issue of whether the one-year statute of limitations of the Illinois Tort Immunity Act even applies here. "Not every action taken by a state official is considered to have occurred under color of state law." *Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 515-16 (7th Cir. 2007). It is unclear at this time whether Defendant Griebel was acting under color of state law or simply as a private citizen in relation to the events at issue. *See id.* ("An action is taken under color of state law if it involves a [m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. Whether a particular action was under color of state law depends largely on the nature of the specific acts the police officer performed, rather than on merely whether he was actively assigned at the moment to the performance of police duties.") (internal quotation marks and citation omitted). But whether the one-year or two-year statute of limitations applies does not affect the Court's resolution of the current motion.

Officer Sean O'Dublan (Star # 1913)" as the officer who struck plaintiff. *See* R. 1 at 1. Plaintiff learned Griebel was O'Dublan shortly before June 22, 2016. There is no doubt that Plaintiff intended to name Griebel as a defendant in the original complaint, which was timely filed on February 21, 2015. He was named, however, under the alias or fictitious name of "Officer O'Dublan." Griebel was named by his correct name for the first time in the First Amended Complaint, which was filed on July 6, 2016. The two-year statute of limitations ran about 3 ½ months earlier, on March 16, 2016, and the one-year statute of limitations ran on March 16, 2015, just after the original complaint was filed.

### 1.    MISNOMER DOCTRINE

Plaintiff argues that the misnomer doctrine applies to allow relation back of the late naming of Griebel in the First Amended Complaint to the timely filing of the original complaint. That doctrine is codified in an Illinois statute, which provides that "[m]isnomer of a party is not a ground for dismissal but the name of any party may be corrected at any time, before or after judgment, on motion, upon any terms and proof that the court requires." 735 Ill. Comp. Stat. Ann. § 5/2-401(b). The Seventh Circuit has described the misnomer doctrine as follows:

> A misnomer is to be distinguished from a case of mistaken identity. "Misnomer" denotes the case in which the plaintiff has the wrong name of the right party, while in a case of mistaken identity the plaintiff has named the wrong party. In that event the plaintiff must serve the correct defendant before the statute of limitations expires; a misnomer can be corrected at any time, provided that the plaintiff serves the defendant with reasonable promptness, even if it is after the statute of limitations has run (as in a case in which the complaint was filed just

13

> before it ran). A misnomer is nothing more than an error in the drafting of the complaint, and it ought to be corrigible by amendment, whereas in a case of mistaken identity the plaintiff has sued the wrong person, and he cannot be allowed by doing that to prevent the right person from pleading the statute of limitations—otherwise, as we have noted, the plaintiff could name "John Doe" in the complaint and take the next twenty years to find out who the actual tortfeasor was.

*Athmer v. C.E.I. Equip. Co. Inc.,* 121 F.3d 294, 296 (7th Cir. 1997) (citations omitted).

To begin with, neither party has clarified to the Court whether the misnomer doctrine, which is an Illinois rule, applies in federal court to Plaintiff's federal and/or state law claims. But if it does, the Seventh Circuit held in *Athmer* that the case before it was "not a misnomer case" because "[t]he plaintiff had no idea at the time he filed the original complaint who the tortfeasor was that he was trying to sue. He knew that it was whoever had manufactured the truck bed but he did not know the identity of that manufacturer. It could have been anyone in the world, as far as the plaintiff knew." *Id.* at 296. The same can be said here. At the time Plaintiff filed suit, she had no idea who the officer was who struck her; as far as Plaintiff knew, it could have been anybody. Indeed, Plaintiff alleged as much in the complaint when she stated that defendants had given her a fictitious name for her assailant. *See* R. 1 at 5 (¶ 30). Thus, this is not a misnomer case.

## 2. RELATION-BACK UNDER RULE 15(c)(1)(C)

Given that the misnomer rule does not apply, the Court looks to Rule 15(c) of the Federal Rules of Civil Procedure to see whether Plaintiff's claims against

Griebel can be said to "relate back" to the timely filing of the original complaint. Rule 15(c) allows relation-back if (1) the amendment asserts a claim that arose out of the conduct or occurrence set out in the original pleading (Fed. R. Civ. P. 15(c)(1)(B)); (2) Griebel received such notice of the action that he will not be prejudiced in defending on the merits (Fed. R. Civ. P. 15(c)(1)(C)(i)); and (3) Griebel knew or should have known that the action would have been brought against him but for the mistake concerning his identity (Fed. R. Civ. P. 15(c)(1)(C)(ii)).

Griebel does not dispute that the first requirement has been met and makes only conclusory arguments for why the second requirement has not been met. Thus, the Court will focus on the third requirement. Griebel argues that the third requirement is not satisfied because Plaintiff did not make a mistake concerning his identity but rather only lacked knowledge about who he was. This Court's recent opinion in *White v. City of Chicago*, 2016 WL 4270152 (N.D. Ill. Aug. 15, 2016), contains an extensive discussion of the mistake issue to which Griebel alludes, in which the Court concluded that the Supreme Court's decision in *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538 (2010), has changed the old "lack of knowledge is not a mistake" rule for purposes of Rule 15(c)(1)(C) relation-back. *See id.* at 15-21. The Court adopts the same reasoning here. After *Krupski*, the proper inquiry under Rule 15(c)(1)(C) focuses not on whether the plaintiff made a mistake about the identity of the defendant who was misnamed but whether the defendant who was misnamed knew or should have known that the action would have been brought against him had the plaintiff known the truth about his identity. *Id.; see also Ryan*

*v. City of Chicago*, 2016 WL 6582570, at *2 (N.D. Ill. Nov. 7, 2016); *Cheatham v. City of Chicago*, 2016 WL 6217091, at *3 (N.D. Ill. Oct. 25, 2016).[10]

Rather than focusing on what he knew or should have known, Griebel mostly argues about what Plaintiff knew or should have known. Even if that were the correct inquiry, the Court could not decide the question on a motion to dismiss because of numerous factual disputes regarding what Plaintiff should have known. But in any event, what Plaintiff should have known is not the relevant inquiry. Griebel only touches upon what he knew or should have known in a single conclusory sentence stating: "It can hardly be considered reasonable to assume that Defendant Deputy Sheriff could have expected to be named in a lawsuit for allegedly attempting to break up a fight, being punched while trying to do so, and having an object thrown at him." R. 98 at 7. This statement ignores of course that the Court must accept Plaintiff's version of the facts in ruling on Griebel's motion to dismiss, and Plaintiff's version is inconsistent with Griebel's statement. Moreover, Griebel's reliance on what he believes is or is not "reasonable to assume" regarding what he should have known is misplaced. The question is *not* what is "reasonable to

---

[10] In addition to the above, the Court also relies on Rule 15(c)(1)(A), which sets out an alternative basis for relation back pursuant to Illinois law (because Illinois law provides the applicable statute of limitations here). Illinois law allows relation back without regard to whether the plaintiff's failure to name the correct defendant was a mistake due to lack of knowledge. The Illinois case law to that effect also is set out in the Court's opinion in *White*, 2016 WL 4270152, at *20-21. The Illinois appellate court decisions cited in the *White* opinion post-date *Krupski* and consider the effect of that Supreme Court case on Illinois' interpretation of its own relation back rule. Defendant Griebel cites to earlier Illinois case law in his brief, but the post-*Krupski* Illinois cases in *White* show those earlier cases are no longer controlling. *See id.; Cheatham*, 2016 WL 6217091, at *4.

assume" about what Griebel knew, but what he in fact knew (or should have known).

The issue of what Griebel knew or shown have known has not been sufficiently addressed in the current briefing, and cannot in any event be answered on the pleadings. To the extent that the pleadings reveal anything on that issue, it would be that Defendant Griebel knew or should have known he was the intended defendant in the original complaint because he struck Plaintiff with his fist (assuming the truth of Plaintiff's allegations). One could also infer that Defendant Griebel knew or should have known he was the intended defendant if he uses the alias or told anyone the evening in question that his name was something akin to "Sean O'Dublan." There are other facts outside the pleadings to which Plaintiff refers in her response to the motion to dismiss that would also support her argument, including the results of the IPRA investigation showing that the Will County Sheriff's Department was contacted and informed about the incident and Griebel's involvement in it shortly after it occurred. Plaintiff need not have alleged these facts because the statute of limitations is an affirmative defense that she is not required to have anticipated. *See, e.g., Covington v. Mitsubishi Motor Mfg. of Am., Inc.,* 154 Fed. App'x 523, 525 (7th Cir. 2005). Griebel argues that Plaintiff has failed to present any evidence to support her claim that he knew or should have known he was the alleged assailant, R. 124 at 5, but that argument is without merit because Plaintiff does not have to present evidence at this stage in the proceedings. *See Gulley v. Moynihan*, 2011 WL 2461813, at *4 (N.D. Ill. June 17, 2011) ("whether

a plaintiff will be able to respond to the statute-of-limitations defense . . . will require evidence that is not required at the motion-to-dismiss stage") (citing *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004)). In short, the Court cannot rule as a matter of law that relation back under Rule 15(c)(1)(C) would not apply here. Therefore, Griebel is not entitled to dismissal of the complaint at this stage of the proceedings on the basis of the statute of limitations having run.

### 3. EQUITABLE ESTOPPEL, EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT

Even apart from the relation-back principles noted above, the Court agrees with Plaintiff that the allegations in the First Amended Complaint regarding a conspiracy among the various defendants to suppress Griebel's identity provides a factual basis for applying one or more of the doctrines of equitable estoppel, equitable tolling, or fraudulent concealment, to toll the running of the statute of limitations from the date the incident took place through sometime in June 2016, when Plaintiff learned Griebel's true name. The First Amended Complaint was filed only a month after Plaintiff learned that "Officer O'Dublan" was really Officer Griebel, and thus would be timely if any of these equitable doctrines were to apply.

Griebel argues that tolling should not apply because Plaintiff has not been diligent in discovering his identity. Aside from the fact that this argument involves disputed issues of fact that cannot be resolved on a motion to dismiss, *see Gulley*, *supra*, 2011 WL 2461813, the history of this litigation with which this Court is familiar shows otherwise. Plaintiff ultimately obtained Griebel's name from a third party after (1) serving the City of Chicago Defendants with discovery requests,

18

(2) serving subpoenas on various suburban law enforcement agencies and the Emerald Society, and (3) filing two motions to compel against the City of Chicago Defendants. Griebel cites to the fact that Plaintiff knew all along that the officer who struck her was a member of the Emerald Society, arguing that this knowledge was enough to have led her to his identity had she been diligent. But as noted previously, Plaintiff's allegations only show that she *suspected* that O'Dublan might not be a Chicago police officer, not that she knew for certain he was not. Moreover, the information Plaintiff received from the Emerald Society included over 70 names of officers, any one of whom could have been the person she was seeking. *See* R. 124-1 at 4. Plaintiff made numerous efforts over the course of more than a year of litigation to obtain information from the City of Chicago Defendants to help her narrow down that list, including photographs, but ultimately was able to learn Griebel's identity only through her own independent efforts.

Moreover, even if the Court were to agree that as of the date Plaintiff received a response to the Emerald Society subpoena she "should have known" that the true identity of "Officer O'Dublan" was Defendant Griebel, the statute of limitations would have begun to run on that date. The exact date Plaintiff received information from the Emerald Society is not in the record, but, according to Griebel, it was in September 2015. *See* R. 124 at 4. Even if the Court could consider this information (which is outside the complaint), the statute of limitations would not have run until either September 2016 (one-year statute) or September 2017 (two-

year statute). Plaintiff's First Amended Complaint was filed in July 2016, and therefore was timely even applying Griebel's discovery theory.[11]

In sum, for all of the above reasons, Defendant Griebel's motion to dismiss based on the statute of limitations is denied.

## B. WILL COUNTY AND WILL COUNTY SHERIFF PAUL KAUPAS

### 1. WILL COUNTY

Will County argues that it is not liable under either *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), or principles of *respondeat superior,* for the acts or omissions of Will County Sheriff Paul Kaupas and/or Deputy Sheriff Matthew Griebel. *See* R. 100 at 3 (citing *Moy v. Cnty. of Cook*, 640 N.E.2d 926, 931 (Ill. 1994) ("The sheriff is a county officer and, as such, is not in an employment relationship with the County of Cook. Therefore, the county may not be held vicariously liable for the sheriff's alleged negligent conduct.")); *see also Martinez v. Sgt. Hain,* 2016 WL 7212501, at *4 (N.D. Ill. Dec. 13, 2016) ("In Illinois, a county sheriff is an independently elected county officer and is not an employee of the county in which the sheriff serves. . . . Accordingly, courts routinely dismiss *Monell* claims against counties predicated on alleged misconduct by the sheriff's office."). Plaintiff concedes Will County's argument. *See* R. 121 at 23. Therefore, Will

---

[11] Griebel apparently believes that Plaintiff should have sent the subpoena to the Emerald Society sooner, and that by waiting until August 2015 to do so, Plaintiff missed at least the one-year statute of limitations. That argument again presumes a number of facts outside the complaint which are not before the Court for purposes of Griebel's motion to dismiss.

County will be dismissed with prejudice as a defendant from Counts VI, VII, and IX of the First Amended Complaint.

Will County admits, however, that Plaintiff states a valid indemnity claim against it based on *Carver v. Sheriff of La Salle County*, 787 N.E.2d 127, 138 (Ill. 2003), which held that, under Illinois law, "the county is obligated to provide funds to the county sheriff to pay official capacity judgments entered against the sheriff's office." *See* R. 100 at 2 (¶ 5) (citing *Carver v. Sheriff of LaSalle Cnty., Ill.*, 324 F.3d 947, 948 (7th Cir. 2003) (per curiam)); *see also Askew v. Sheriff of Cook Cnty., Ill.*, 568 F.3d 632, 636 (7th Cir. 2009) (holding that, because Illinois law requires the county to pay, the county "is a necessary party in any suit seeking damages from an independently elected county officer (sheriff, assessor, clerk of court, and so on) in an official capacity"). Therefore, Will County will remain a defendant in this case as to Count V of the First Amended Complaint.

## 2. WILL COUNTY SHERIFF PAUL KAUPAS

Sheriff Kaupas argues that Plaintiff has failed to allege a plausible *Monell* claim against him. The Court will address Sheriff Kaupas's *Monell* argument later in this opinion. In addition to her *Monell* claim, Plaintiff also appears to argue in her brief that the Sheriff is liable under the doctrine of *respondeat superior* for her state law battery and IIED claims against Defendant Griebel in Counts VI and VII. *See* R. 121 at 23. The First Amended Complaint, however, only mentions Will County in these two counts. *See* R. 62 at 10-11. Plaintiff either erroneously named Will County in place of Sheriff Kaupas or else assumed that Will County and the

Will County Sheriff's Office was the same defendant. Nonetheless, the Sheriff admits in his brief that he is a proper defendant in his official capacity in Counts VI and VII in place of Will County. *See* R. 100 at 4 ("the proper party defendant for Plaintiff's *respondeat superior* claims . . . is the Will County Sheriff's Office, not Will County."). Therefore, the Court will substitute Sheriff Kaupas in his official capacity in the place of Will County in Counts VI and VII of the First Amended Complaint.

### C.   CITY OF CHICAGO DEFENDANTS

The City of Chicago Defendants argue that dismissal is appropriate for Plaintiff's § 1983 claim and each of Plaintiff's state tort law claims. The Court will address each of the City of Chicago Defendants' arguments in turn.

### 1.   COUNT II—§ 1983 CLAIM

Section 1983 provides a civil cause of action to any citizen of the United States against any person who, under color of state law, deprives the citizen of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. To succeed on a § 1983 claim, a plaintiff must prove two elements: (1) that he was deprived of a right secured by the Federal Constitution or laws of the United States; and (2) that he was subjected to this deprivation by a person acting under the color of state law. *West v. Atkins,* 487 U.S. 42, 48 (1988). Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144, n.3 (1979). In addressing constitutional claims brought under § 1983, therefore, "analysis begins by identifying the specific

constitutional right allegedly infringed." *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Baker*, 443 U.S. at 140 (the "first inquiry" is "to isolate the precise constitutional violation with which [the defendant] is charged").

The City of Chicago Defendants argue Plaintiff's § 1983 claim against them is legally deficient because Plaintiff has not identified a constitutional right that they allegedly infringed. The Court begins by noting "[d]eplorable conduct by police officers is not alone enough under section 1983 for an actionable deprivation of a plaintiff's right to seek judicial relief." *Rainey v. City of Chicago*, 2013 WL 941968, at *12 (N.D. Ill. Mar. 11, 2013). In addition, the Court notes that, while Plaintiff must allege a factual basis for finding that one or more of her constitutional rights have been violated by the police conduct at issue, she need not correctly identify the constitutional right in her complaint. *See Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014) (per curiam) (summarily reversing a decision of the Court of Appeals for the Fifth Circuit, stating that the Federal Rules of Civil Procedure "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted"). Plaintiff's § 1983 claim against the City of Chicago Defendants is found in Count II, which Plaintiff titles "Failure to Prosecute." As the City of Chicago Defendants correctly point out, a mere "failure to prosecute" does not violate the constitution. *See, e.g., Linda R.S. v. Richard D.*, 410 U.S. 614, 619, (1973) ("a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another"). Nor do the police violate the constitution if they simply fail to make a proper investigation of a suspected crime. *See Rossi v. City of*

*Chicago,* 790 F.3d 729, 735 (7th Cir. 2015) (holding that the plaintiff "does not have a constitutional right to have the police investigate his case at all, still less to do so to his level of satisfaction"). The Court addresses below, however, three other potential legal theories, which are either directly addressed by the parties or else alluded to in the complaint and/or briefs and which might support Plaintiff's § 1983 claim based on the City of Chicago Defendants' alleged cover-up of Defendant Griebel's identity.[12]

### a. SELECTIVE PROSECUTION

Plaintiff argues that the alleged facts state a constitutional violation of the Equal Protection Clause of the Fourteenth Amendment. In support of this argument, Plaintiff cites to the Seventh Circuit's decisions in *Esmail v. Macrane*, 53 F.3d 176 (7th Cir. 1995), and *Olech v. Village of Willowbrook*, 160 F.3d 386 (7th Cir. 1998), *aff'd,* 528 U.S. 562 (2000). In *Esmail,* the court differentiated an equal protection claim based on a theory of failure to prosecute and an equal protection

---

[12] Although Plaintiff relies on § 1983 for stating a constitutional claim based on the alleged police cover-up by the City of Chicago Defendants, another potential vehicle for asserting that claim is 42 U.S.C. § 1985(2), which prohibits conspiracies to obstruct the course of justice in state courts. The problem in this case with a § 1985(2) claim, however, is that it requires proof that the obstruction of justice was motivated by racial or other class-based animus. *See Wright v. Ill. Dep't of Children & Family Servs.*, 40 F.3d 1492, 1507 (7th Cir. 1994) ("a plaintiff must allege class-based animus to state a claim [under § 1985(2)] for denial of access to state courts") (citing *Griffin v. Breckenridge*, 403 U.S. 88 (1971)); *see also Bell v. Weis*, 2015 WL 4972467, at *3 (N.D. Ill. Aug. 19, 2015) ("If the obstruction of justice is alleged to have occurred in a state-court proceeding, as here, the plaintiff must plead a race- or class-based animus to state a claim."). Plaintiff has not alleged any class-based animus, and therefore her factual allegations of an obstruction of justice against the City of Chicago Defendants must stand or fall on whether she has alleged a constitutional deprivation cognizable under § 1983.

claim based on a theory of selective prosecution. 53 F.3d at 178-79. The former, the court explained, was not a valid legal theory despite the fact that a failure to prosecute undeniably results in unequal treatment.[13] But a claim of selective enforcement is different, the court said, than a claim of nonenforcement: "The charge here is that a powerful public official picked on a person out of sheer vindictiveness. . . . [W]here the decision to prosecute is made either in retaliation for the exercise of a constitutional right, such as the right to free speech or to the free exercise of religion, or because of membership in a vulnerable group," an equal protection claim arises. *Id.* at 179; *see also Olech,* 160 F.3d at 388 ("the 'vindictive action' class of equal protection cases requires proof that the cause of the differential treatment of which the plaintiff complains was a totally illegitimate animus toward the plaintiff by the defendant"); *La Playita Cicero, Inc. v. Town of Cicero, Ill.*, 175 F. Supp. 3d 953, 967 (N.D. Ill. 2016) ("The government may not selectively enforce a law against someone based on his race or his exercise of a constitutional right without violating the Equal Protection Clause.") (citing *Esmail* and *Wayte v. United States*, 470 U.S. 598, 608 (1985)).

Plaintiff argues that she has stated a selective prosecution claim because she alleges that, when she went to the police station the day after the incident to make

---

[13] *See Esmail,* 53 F.3d at 178-79 ("The resulting pattern of nonenforcement may be random, or an effort may be made to get the most bang for the prosecutorial buck by concentrating on the most newsworthy lawbreakers, but in either case the result is that people who are equally guilty of crimes or other violations receive unequal treatment, with some being punished and others getting off scot-free. That form of selective prosecution, although it involves dramatically unequal legal treatment, has no standing in equal protection law.").

a formal complaint against Griebel, Detective Callaghan told her not to pursue the matter and then threatened to charge her with a crime if she did not forgo the investigation. Under this theory, only Detective Callaghan, and not Officer Maas, would be a proper defendant under Count II. Moreover, there is no allegation here that Detective Callaghan followed through on his threat to charge Plaintiff with a crime. Plaintiff has cited no case law that would support the view that a claim for selective prosecution exists where there has been no prosecution. Accordingly, the Court declines to rely on Plaintiff's theory of selective prosecution to support Plaintiff's claim against the City of Chicago Defendants as alleged in Count II of the First Amended Complaint.

### b. RETALIATION FOR PLAINTIFF'S EXERCISE OF HER FIRST AMENDMENT RIGHTS

Even though the Court finds Plaintiff's selective enforcement theory inapplicable on the facts alleged here, a slightly different but overlapping theory is whether Detective Callaghan's alleged threat constituted retaliation for Plaintiff's exercise of her First Amendment rights. *See Thayer v. Chiczewski*, 705 F.3d 237, 255 (7th Cir. 2012) (noting that First Amendment retaliation claims and class-of-one equal protection claims may "coalesce" to such an extent that they either stand or fall together, but nevertheless addressing the two theories separately). Plaintiff appears to assert this theory in the context of arguing her equal protection claim. *See* R. 121 at 22 ("[the City of Chicago] Defendants' refusal to prosecute Defendant [Griebel] and attempt to instead prosecute [Plaintiff] as retaliation for exercising her constitutional rights amounts to selective prosecution").

"The law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To make out a prima facie case of retaliation in violation of the First Amendment, Plaintiff must show that (1) she engaged in activity protected by the First Amendment; (2) she suffered a deprivation that would likely deter First Amendment activity; and (3) the First Amendment activity was at least a motivating factor behind the deprivation Plaintiff was made to suffer. *Thayer*, 705 F.3d at 255; *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012).

Plaintiff has alleged that she engaged in First Amendment activity when she met with Detective Callaghan to pursue her criminal complaint against Griebel. *See Estate of Morris ex rel. Morris v. Dapolito,* 297 F. Supp. 2d 680, 692 (S.D.N.Y. 2004) (holding that student's "actions in seeking the criminal prosecution of [the teacher who assaulted him] were protected by the First Amendment") (quoting *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994) ("The rights to complain to public officials and to seek administrative and judicial relief are protected by the First Amendment.") (citing *United Mine Workers v. Ill. Bar Assoc.*, 389 U.S. 217, 222 (1967) (the right "to petition for a redress of grievances [is] among the most precious of liberties safeguarded by the Bill of Rights"))). Given that Plaintiff was not charged with any crime when the incident took place, she also has alleged sufficient facts from which to infer that Detective Callaghan's threat to prosecute her was motivated by her First Amendment activity of seeking to pursue charges against

Griebel. *See Gagliardi*, 18 F.3d at 195 ("While a bald and uncorroborated allegation of retaliation might prove inadequate to withstand a motion to dismiss, it is sufficient to allege facts from which a retaliatory intent on the part of the defendants reasonably may be inferred.").

Nevertheless, there still remains the issue of whether Detective Callaghan's alleged threat of prosecution is sufficient to satisfy the requirement of retaliatory conduct "that would likely deter First Amendment activity in the future" when no actual prosecution ever took place. *See Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise."). Neither party has addressed this issue, and therefore the Court will defer it until later in the proceedings. *See Wehrs v. Wells*, 688 F.3d 886, 891 n. 2 (7th Cir. 2012) ("[t]he Court will not address this undeveloped argument lacking legal authority"); *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010) ("it is not this court's responsibility to research and construct the parties' arguments").

### c.   DENIAL OF JUDICIAL ACCESS

A third legal theory for allowing Plaintiff to go forward with Count II is that the City of Chicago Defendants' alleged cover-up of Griebel's identity violated Plaintiff's constitutional right of access to the courts. *See* R. 62 at 7 (First Am. Cmplt., ¶ 45) ("As a result of Defendant Officers' unlawful conduct the Plaintiff was deprived of key information likely required to be successful in a civil prosecution for

personal injuries."). The Supreme Court has said that "[t]he right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government." *Chambers v. Baltimore & Ohio RR.*, 207 U.S. 142, 148 (1907); *see also Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972) ("the right of access to the agencies and courts to be heard . . . is part of the right of petition protected by the First Amendment"); *Harris v. Pate*, 440 F.2d 315, 317 (7th Cir. 1971) (right of access to courts is encompassed by the First Amendment right to petition, and efforts by state actors to interfere with an individual's constitutional right to court access may be actionable under § 1983); *Sigafus v. Brown*, 416 F.2d 105 (7th Cir. 1969) (same). "To prove a violation of this right, a plaintiff must demonstrate that state action hindered his or her efforts to pursue a nonfrivolous legal claim and that consequently the plaintiff suffered some actual concrete injury." *May v. Sheahan*, 226 F.3d 876, 883 (7th Cir. 2000) (citing *Lewis v. Casey*, 518 U.S. 343, 350-54 (1977)). Plaintiff's allegations, if true, support a claim that the actions of the City of Chicago Defendants hindered Plaintiff's efforts to pursue a nonfrivolous state law tort claim against Defendant Griebel by hiding Griebel's identity from her. As the Seventh Circuit has held, "when police officers conceal or obscure important facts about a crime from its victims rendering hollow the right to seek redress, constitutional rights are undoubtedly abridged." *Vasquez v. Hernandez*, 60 F.3d 325, 329 (7th Cir. 1995).

The City of Chicago Defendants respond that Plaintiff has not shown an actual injury. Indeed, they argue, Plaintiff has "pled herself out of court" by alleging that she knew the evening of the incident that the perpetrator of the alleged crime was Defendant Griebel. *See* R. 90 at 6 (citing paragraph 34 of the First Amended Complaint); R. 123 at 10 (citing *Thompson v. Boggs*, 33 F.3d 847, 852-53 (7th Cir. 1994) (affirming dismissal of plaintiff's denial of access claim because plaintiff had firsthand knowledge of the facts which would enable him promptly to file a lawsuit)). But the City of Chicago Defendants' reliance on paragraph 34 of the First Amended Complaint to show that Plaintiff has pled herself out of court is misplaced. Paragraph 34 alleges that the *IPRA* knew on the evening of the incident that the officer who assaulted Plaintiff was Will County Sheriff's Deputy Matthew Griebel. *See* R. 5 at 17. It is very clear from the history of this case that *Plaintiff* did not know what the *IPRA knew* until the City of Chicago Defendants turned over the IPRA investigation files, which was not until June 2016. The City of Chicago Defendants are well aware of this timing, because the Court awarded sanctions against them for their failure to provide this information to Plaintiff any earlier. Therefore, the Court concludes that Plaintiff has made no such admission of knowledge in her complaint. Further, based on the allegations of the complaint, the Court cannot say that Plaintiff knew or should have known all relevant facts giving rise to her claim, including the real identity of "Officer O'Dublan." *See, e.g., Thomas v. City of Blue Island,* 178 F. Supp. 3d 646, 653 (N.D. Ill. 2016) (rejecting the defendants' argument on a motion to dismiss a denial of access claim that the

plaintiff should have discovered the identity of the alleged tortfeasor "on her own," holding that the court must accept the plaintiff's allegations that she had done "everything should could to spur the BIPD into continuing the investigation" and that "Defendants falsified and concealed the information").

The City of Chicago Defendants also argue that "[t]he presence of the instant lawsuit shows that Plaintiff has not been denied access to the courts." R. 123 at 9. "A denial of access to the courts arises only where an alleged cover-up is to some extent successful." *LaPorta v. City of Chicago*, 102 F. Supp. 3d 1014, 1023 (N.D. Ill. 2015). It is true that Plaintiff has now identified and named her alleged assailant, Defendant Griebel, in this lawsuit. But Griebel has filed a motion to dismiss Plaintiff's claims against him as being time-barred because Plaintiff failed to discover his identity prior to the expiration of the statute of limitations. Even though the Court has denied Griebel's motion, he can always revisit the statute of limitations issue later in these proceedings. Therefore, the potential still exists that the City of Chicago Defendants' alleged cover-up actually will cause a denial of access to the courts for Plaintiff.

Moreover, the Seventh Circuit has cautioned that "defendants need not literally bar the courthouse door" for a right of access claim to arise. *Bell v. City of Milwaukee*, 746 F.2d 1205, 1261 (7th Cir.1984), *overruled on other grounds by Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005). As the Supreme Court has said, access to courts does not only protect one's right to physically enter the courthouse halls, but also insures that the access to courts will be "adequate, effective and meaningful."

*Bounds v. Smith*, 430 U.S. 817, 822 (1977). The Seventh Circuit has held that an allegation of delay alone is sufficient to state a denial of access claim. *See May*, 226 F.3d at 883 (plaintiff's allegation of delay in the final disposition of his case was sufficient "[u]nder the generous standards applicable to a complaint reviewed on a motion to dismiss" to state a claim for denial of access to the courts); s*ee also Ryland v. Shapiro*, 708 F.2d 967, 975 (5th Cir. 1983) ("The defendants' actions could have prejudiced the [plaintiffs'] chances of recovery in state court because the resulting delay would cause stale evidence and the fading of material facts in the minds of potential witnesses. Moreover, it could well prove more expensive to litigate such action. Finally, any interference with a substantive constitutional right, such as the right of access to the courts, may by itself amount to a constitutional deprivation (unless reasonably justified by a countervailing state interest).").

Several courts in this district have upheld a denial of access claim based on delay where the delay forced the plaintiff to confront burdens in the litigation she otherwise would have avoided. For instance, in *Cook v. City of Chicago*, 2014 WL 4493813 (N.D. Ill. Sept. 9, 2014), the court held that a reasonable jury could find that the plaintiff's delay in suing the police officers who allegedly assaulted him, which delay was due at least partly to the conduct of the investigating officer who allegedly threatened him if he did not drop his complaint against the assaulting officers, prejudiced the plaintiff because it forced him to confront statute of limitations defenses and arguments in opposition to equitable estoppel made in the litigation by the assaulting officers. *Id.* at *7. In *Rainey*, 2013 WL 941968, at *12,

the court held that the plaintiff was prejudiced because he testified that he covered his face to protect it during an attack and was therefore unable to identify which officers were harming him. "He did not know all the facts necessary to bring his claim, and could not obtain them without deposing each of the dozens of officers present at the scene." *Id.* And in *LaPorta,* 102 F. Supp. 3d at 1024, the court held that, "[a]lthough the 'courthouse door' ha[d] not yet closed completely (as the City now concedes that [plaintiff's] claims may not be time barred)," the plaintiff nevertheless was prejudiced by the delay in bringing his claims that was caused by the defendant's conduct because he had "to litigate numerous motions to compel and sanctions motions in the state court action, and to confront a challenge [ ] that his *Monell* claim [was] time barred." Similar to the facts in these cases, Plaintiff has suffered prejudice from the City of Chicago Defendants' alleged misconduct by having to conduct extensive discovery for a period of more than a year in an attempt to learn Griebel's identity, as well as to defend against Griebel's motion to dismiss based on a statute of limitations defense.

In *Vasquez*, 60 F.3d at 329, the Seventh Circuit held that no constitutional injury had occurred when police misconduct delayed the disclosure of key facts for a mere six months, and plaintiffs were still able to bring an action in state court. And in *Rossi*, 790 F.3d at 736, the Seventh Circuit again held that no constitutional injury had occurred because the misbehavior of the police "did not so damage the plaintiff's litigation posture that it precluded adequate relief." Contrary to the City of Chicago Defendants' arguments, *Vasquez* and *Rossi,* both of which were decided

on summary judgment, do not require dismissal of Plaintiff's denial of access claim here. In *Rossi*, the Seventh Circuit made clear that the legal sufficiency of a denial of access claim depends on a number of factors, including (1) the effects of the alleged cover-up on the plaintiff's right to bring suit in court, (2) the order of magnitude of the misbehavior of the officers who are alleged to have conducted a cover-up (*i.e.*, police malfeasance, such as a police evidentiary cover-up, versus mere misfeasance or nonfeasance); and (3) whether any curative measures were taken by the police department after the cover-up was revealed. *Id.* The facts before the Seventh Circuit on summary judgment in those cases are distinguishable from the facts pled in this case. For instance, in both *Vasquez* and *Rossi* there were "curative measures" by which "a proper investigation was conducted within months of the crime and before the expiration of the limitations period." *Rossi,* 790 F.3d at 736. More importantly, neither *Rossi* nor *Vasquez* involved a police attempt to cover-up the identity of the alleged tortfeasors over an extended period of time. *See Rossi*, 790 F.3d at 736 (stating that the police officer "did not conceal any facts about the incident that were not already known to [the plaintiff]," and that the plaintiff "*knew who the perpetrators were*, where the incident occurred, and [ ] had full access to much of the evidence required to prevail in a civil suit: witnesses, medical records, police reports, and other documentary evidence") (emphasis added). In another case where a district court dismissed a denial of access claim on the complaint, the court did so because the plaintiffs admitted that "they personally identified the Assailants for the police" thereby demonstrating that they had "firsthand knowledge of the

facts necessary to file a civil action when the claim arose." *Buchmeier v. City of Berwyn*, 2015 WL 4498742, at *3 (N.D. Ill. July 23, 2015). The facts alleged by Plaintiff regarding the City of Chicago Defendants' cover-up are starkly different from the facts at issue in these cases. Plaintiff did not know the identity of her assailant and was actively blocked by the City of Chicago Defendants for more than a year from obtaining that information.[14]

"An analysis of the extent of a constitutional deprivation is not an exact science capable of quantification; rather, it is qualitative in nature." *Ryland*, 708 F.2d at 974. "What constitutes obstructive action [will be] fact-intensive and context-specific." *West v. Brankel*, 2015 WL 225465, at *8 (W.D. Mo. Jan. 16, 2015). Based on the facts alleged and the course of this litigation thus far, it appears that Plaintiff did not know the identity of the person who assaulted her, that she was diligent in trying to discover it based on the facts known to her, that the City of Chicago Defendants falsified information to keep Plaintiff from learning her assailant's identity and threatened her for pursuing her charges, and that no

---

[14] In *Vasquez*, it appears that the plaintiff may not have known the identity of the person who shot him. But there also is no indication that the plaintiff sought that information directly from the investigating officers or that those officers affirmatively misled him or threatened him with criminal prosecution for asking. Moreover, the Cicero Police Department eventually conducted a full investigation of the incident and released all the records of that investigation to the plaintiff. As the Seventh Circuit explained, "the actual circumstances surrounding the shooting here were revealed publicly within six months of the incident. And subsequent to the Task Force's investigation, the Vasquezes were granted access to the records of that investigation for use in their own legal action. Hence, the delay, albeit frustrating for the Vasquezes, has not been without some benefit for them. Armed with the information unearthed by the Task Force, they are at a significant advantage in a state tort action against the defendants." *Vasquez*, 60 F.3d at 329.

curative investigation was ever conducted. It also appears that Plaintiff may have suffered prejudice in this litigation as a result of the City of Chicago Defendants' alleged cover-up. Accordingly, the Court holds that Plaintiff has stated a valid claim for denial of judicial access.

## 2.     COUNT III—§ 1983 CONSPIRACY CLAIM

The City of Chicago Defendants argue that Plaintiff's allegations are insufficient to sustain her conspiracy claim. "To establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). It is well-settled in this Circuit that "[t]o be liable as a conspirator you must be a voluntary participant in a common venture, although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988).

The City of Chicago Defendants argue that Plaintiff's conspiracy allegations are insufficient under *Iqbal,* and also assert that, in any event, the conspiracy count fails because there is no underlying constitutional violation. The Court already has found that the complaint adequately alleges a constitutional violation of the right to judicial access. Based on the factual allegations regarding an alleged police cover-up concerning the identity of Plaintiff's assailant, the Court also finds that the

36

complaint adequately alleges the voluntary participation of the City of Chicago Defendants in a common venture, the general objectives of which they either explicitly or implicitly accepted and agreed to further with their alleged conduct, namely, the cover-up of Griebel's identity. *See Thomas,* 178 F. Supp. 3d at 654 (denying motion to dismiss § 1983 conspiracy claim "[b]ecause Plaintiff has sufficiently alleged her First and Fourteenth Amendment deprivation of access to courts claim"); *Rainey*, 2013 WL 941968, at *10 ("Plaintiff offers more than mere discrepancies in testimony and speculation about motive. . . . [A] jury could infer that DeLaurentis's procurement of signatures on blank misdemeanor complaints and Defendants' willingness to swear to false charges against Rainey after he was seriously injured reflect a conspiracy to conceal Defendants' use of excessive force."). Insofar as Defendant Griebel is concerned, he does not contest that the complaint adequately alleges a constitutional violation against him. The Court also finds that a reasonable jury could infer Defendant Griebel's participation in the alleged conspiracy to cover-up his identity because the interest being protected by the alleged conspiracy was his interest, and because Plaintiff alleges that a conversation took place between Griebel and Officer Maas followed by Griebel immediately getting on the bus and leaving the scene of the incident without having given his real name.

Finally, the Court finds that the complaint's allegations adequately apprise Defendants of the alleged conspiracy, including: (1) the identity of the individuals who reached an agreement (Maas, Callaghan and Griebel); (2) the nature of the

agreement (to hide Griebel's identity from Plaintiff and thwart Plaintiff's investigation of the assault against her); and (3) the overt acts of each defendant in furtherance of the conspiracy (Griebel assaulted Plaintiff; Griebel and Maas had a conversation about the assault immediately after it took place; Maas directed Griebel to get on the bus and leave; Griebel gave a fictitious name and then left; Maas wrote down Griebel's fictitious name in the police report and identified him as a witness rather than the alleged assailant; Callaghan was "apathetic" when Plaintiff attempted to file criminal charges the next day; Callaghan threatened Plaintiff with criminal prosecution if she continued to pursue her claims; Callaghan failed to conduct any further investigation of the alleged assault). Thus, the Court concludes that Plaintiff has adequately alleged her conspiracy claim. *See Thomas*, 178 F. Supp. 3d at 654 (rejecting the defendants' argument that the plaintiff had "omitted the 'what, when, where, why, and how' regarding the conspiracy," because the particularity requirements of Federal Rule of Civil Procedure 9(b) do not apply to a § 1983 conspiracy claim, and upholding the plaintiff's allegations which set forth "the parties, the purpose, and the approximate date of the alleged conspiracy" to commit a violation of the plaintiff's constitutional right to access the courts).

### 3. COUNT VII—IIED

The City of Chicago Defendants argue that Plaintiff's allegations are insufficient to sustain her IIED claim. "To recover on a claim for IIED, Illinois law requires a plaintiff to prove: (1) that the conduct was extreme and outrageous, (2) that the actor intended that his conduct inflict severe emotional distress or knew

that there was a high probability that his conduct would inflict such distress, and, (3) that the conduct in fact caused severe emotional distress." *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015). The tort of IIED does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 467 (7th Cir. 2016) (citation omitted). Instead, for "conduct to be extreme and outrageous it must go 'beyond all bounds of decency' and be 'considered intolerable in a civilized community.'" *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010) (citation omitted).

The Court cannot say that the alleged actions of City of Chicago police officers covering up a battery committed by a Will County deputy sheriff, falsifying police investigation reports, and/or threatening a crime victim with criminal prosecution if she continued to seek information about her assailant's identity, do not as a matter of law constitute extreme and outrageous conduct or conduct that goes "beyond all possible bounds of decency." Illinois cases in which intentional infliction of emotional distress has been sufficiently alleged frequently involve a defendant who stood in a position of power or authority relative to the plaintiff. *See Milton v. Ill. Bell Tele. Co.* 427 N.E.2d 829, 832 (Ill. App. 1981) ("As Dean Prosser pointed out, 'The extreme and outrageous nature of the conduct may arise not so much from what is done as from abuse by the defendant of some relation or position which gives him actual or apparent power to damage the plaintiff's interests. The result is something very like extortion.'" (quoting PROSSER ON TORTS, 4th Ed., p. 56)); *accord* RESTATEMENT (SECOND) OF TORTS, § 46, Comment e; *see also McGrath*

*v. Fahey*, 533 N.E.2d 806, 809-10 (Ill. App. 1988) (holding that threats "are much more likely to be a part of outrageous conduct when made by someone with the ability to carry them out then [sic] when made by someone in a comparatively weak position," and citing "police officers, school authorities, landlords and collecting creditors as examples of the many types of individuals who may be positioned to exercise power or authority over a plaintiff").

In *Buchmeier*, 2015 WL 4498742, at *6, the court held that "an isolated threat that never materialized," even though by a person in a position to exercise authority over the plaintiff, did not rise to the level of extreme and outrageous behavior. But here Plaintiff alleges one threat combined with failing to conduct any investigation of the assault against her, facilitating Officer Griebel's quick departure from the scene of the incident, and hiding the identity of Plaintiff's assailant by falsifying police reports. These additional allegations distinguish *Buchmeier*. *See, e.g., Thomas*, 178 F. Supp. 3d at 655 (denying motion to dismiss IIED claim for conspiracy to commit violation of plaintiff's constitutional right of access to the courts where the plaintiff alleged that the defendants failed to properly investigate the criminal death of her child, falsified police reports, concealed the hit-and-run crime, and retaliated against a fellow police officer in an effort to conceal the perpetrator of the hit-and-run crime); *cf. Vasquez,* 60 F.3d at 329 (where the plaintiff alleged a police cover-up, court states that "[t]he deplorable nature of [the defendants'] conduct is without question"); *West v. Brankel*, 2015 WL 225465, at *13 (W.D. Mo. Jan. 16, 2015) (denying qualified immunity in police

cover-up case, and stating that "[c]ommon sense alone should inform a reasonable police officer that using his position of authority to cover up police involvement in a citizen's death . . . is a wrong of constitutional magnitude").

The same principle of outrageousness based on the defendant's position of power applies to Defendant Griebel's argument that Plaintiff's IIED claim against him is insufficiently pled. Griebel allegedly was wearing a law enforcement badge at the time of the incident, and is alleged to have thrown Plaintiff to the ground and punched her in the face even though she visibly had her arm in a sling. The Court cannot say at this point to what extent Griebel may have used his apparent position of authority as a law enforcement officer when engaging in this conduct. To the extent that he may have, however, the Court concludes that a reasonable jury could find that Griebel's conduct constituted an intentional or reckless abuse of power by a government official that rises to the level of extreme and outrageous conduct.

### 4. ILLINOIS TORT IMMUNITY ACT

The City of Chicago Defendants assert, without any argument or case support, that Plaintiff's IIED claim is barred by the immunity from liability found in the Illinois Tort Immunity Act for injuries stemming from a failure to provide police protection. *See* 745 Ill. Comp. Stat. Ann. § 10/4-102. The City of Chicago Defendants provide no legal authority and have not otherwise developed this argument. For purposes of their motion to dismiss, therefore, it is waived. *See United States v. Hassebrock*, 663 F.3d 906, 914 (7th Cir. 2011) (explaining that "perfunctory and undeveloped arguments, and arguments that are unsupported by

pertinent authority, are waived" (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991))).

In addition, the argument appears to stem from the ill-founded assumption that Plaintiff's claims against the City of Chicago Defendants are based on their conspiracy with Griebel to commit the assault, or else their failure to prevent, to investigate, and/or to prosecute the assault. As the Court already has found, Plaintiff's claims against the City of Chicago Defendants are not based on any of these things; instead, Plaintiff's claims are based on the City of Chicago Defendants' alleged cover-up of Griebel's identity after the assault occurred.

Finally, the City of Chicago's argument, that under the Tort Immunity Act it cannot be held liable if Officer Maas and Detective Callaghan are not liable, is premature. The tort immunity to which the City refers, 745 Ill. Comp. Stat. Ann. § 10/2-109, would apply only if Maas and Callaghan are found to not be liable for Plaintiff's tort claim against them. Therefore, the *respondeat superior* and indemnification claims against the City of Chicago are not subject to dismissal at this time on this basis.

### D. *MONELL* CLAIMS

Count IX of the First Amended Complaint alleges a *Monell* claim against Will County Sheriff Kaupas and Count X alleges a *Monell* claim against the City of Chicago. The Court considers these claims separately below.

## 1. WILL COUNTY SHERIFF KAUPAS

To adequately allege a *Monell* claim against Sheriff Kaupas, Plaintiff must plead factual content that allows the Court to draw the reasonable inference that the Sheriff maintained a policy, custom, or practice that contributed to the use of excessive force and/or cover-up of the use of force by Deputy Sheriff Griebel. *See Karney v. City of Naperville*, 2015 WL 6407759, at *3 (N.D. Ill. Oct. 22, 2015) (quoting *McCauley v. City of Chi.*, 671 F.3d 611, 618 (7th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678)). "[A] plaintiff may demonstrate the existence of municipal policy or custom in one of three ways: proof of an express policy causing loss, a widespread practice constituting custom or usage that caused the loss, or causation of the loss by a person with final policymaking authority." *Kujawski v. Bd. of Comm'rs of Bartholomew Cnty., Ind.*, 183 F.3d 734, 737 (7th Cir. 1999). Plaintiff does not allege any facts that would support a *Monell* claim under either the first or third categories. Instead, Plaintiff attempts to rely on the second category concerning a widespread practice constituting a custom or usage.

For Plaintiff to show that the alleged customs were attributable to the Will County Sheriff and thus had the force of law, she must show that the Sheriff was "'deliberately indifferent as to [their] known or obvious consequences.'" *Gable v. City of Chi*cago, 296 F.3d 531, 537 (7th Cir. 2002) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 406-07 (1997)). "In other words, [the Sheriff] must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Thomas v. Cook Cnty. Sheriff's Dep't,* 604

F.3d 293, 303 (7th Cir.), *cert. denied*, 562 U.S. 1061 (2010). "[I]n situations where rules or regulations are required to remedy a potentially dangerous practice, the [Sheriff's] failure to make a policy is also actionable." *Id.* (citing *Sims v. Mulcahy*, 902 F.2d 524, 543 (7th Cir.1990) (quoting *Jones v. City of Chicago*, 787 F.2d 200, 204-05 (7th Cir. 1986))). The Seventh Circuit, however, has not "adopt[ed] any bright-line rules defining a 'widespread custom or practice.'" *Thomas*, 604 F.3d at 303. In fact, "there is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, except that it must be more than one instance, or even three." *Id.* (quoting *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988), and *Gable*, 296 F.3d at 538) (internal quotation marks omitted). The general principle, however, is that "the plaintiff must demonstrate that there is a policy at issue rather than a random event." *Id.* The policy may be implicit, or it may take the form of "a gap in expressed policies, or a series of violations to lay the premise of deliberate indifference." *Id.* (citations omitted). But "[b]eyond these threshold requirements, the jury must make a factual determination as to whether the evidence demonstrates that the [Sheriff] had a widespread practice that [caused] the alleged constitutional harm." *Id.* (citing *Woodward v. Corr. Med. Serv. of Ill., Inc.*, 368 F.3d 917, 928 (7th Cir. 2004)).

The issue in this case is preliminary to the one before the *Thomas* court, which addressed the standards for *Monell* liability on a post-verdict motion for judgment as a matter of law. The issue here is whether Plaintiff has alleged sufficient facts to move beyond the pleadings stage on her *Monell* liability claim

against Sheriff Kaupas. The Court holds that she has not. Plaintiff alleges in only a conclusory fashion that the Sheriff has "a policy and/or custom . . . to inadequately and improperly investigate citizen complaints of police misconduct," and to "inadequately supervise and train officers of the Will County Sheriff's Office, . . . thereby failing to adequately discourage further constitutional violations on the part of these officers." R. 62 at 13 (¶¶ 76-77). Her further allegation that "Kaupas and other County policy makers are aware of, and condone and facilitate by their inaction, an environment within the Will County Sheriff's Office in which officers fail to report misconduct committed by other officers, such as the misconduct at issue in this case" (*id.,* ¶ 78), also is conclusory. No other facts alleged in the complaint regarding the Sheriff or the Sheriff's office are alleged from which the Court could infer a factual basis for these conclusory *Monell* allegations.

"[I]t is necessarily more difficult for a plaintiff to demonstrate an official policy or custom based only on his own experience because what is needed is evidence that there is a true municipal policy at issue, not a random event." *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008). For this reason, courts in this district generally dismiss *Monell* claims in which "[a]ll of the allegations in the Complaint pertain exclusively to [the plaintiff]." *Davis v. Metro. Pier & Exposition Auth.*, 2012 WL 2576356, at *12 (N.D. Ill. July 3, 2012); *see also Lewis v. Cnty. of Cook*, 2011 WL 839753, at *14 (N.D. Ill. Feb. 24, 2011) (dismissing *Monell* claim because the plaintiff "does not allege facts supporting retaliatory conduct against anyone other than herself"); *Travis v. City of Chicago*, 2012 WL 2565826, at *5

(N.D. Ill. June 29, 2012) ("although [the plaintiff] states that he himself made complaints, he does not identify any other people who complained to the City"). Plaintiff makes no allegations about any similar incidents or complaints against Sheriff Kaupas from which the Court can infer that the Sheriff was at fault either for Griebel's use of force against Plaintiff or the alleged conspiracy to cover-up Griebel's identity after the assault occurred. To the extent that Plaintiff's *Monell* claim is based on a failure to train, supervise, and discipline, Plaintiff's allegations too are not supported by non-conclusory facts. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). Plaintiff does not allege any similar constitutional violations by which a failure to train can plausibly be inferred. *See Hardy v. Wexford Health Sources, Inc.*, 2015 WL 1593597, at *15 (N.D. Ill. Apr. 2, 2015); *Velazquez v. Williams*, 2015 WL 4036157, at *3-4 (N.D. Ill. June 30, 2015).

Absent any factual allegations that would give rise to a credible inference that Sheriff Kaupas's own conduct contributed to the alleged constitutional violations, Plaintiff's *Monell* claim against the Sheriff must be dismissed. *See Monell*, 436 U.S. at 691, 694 (liability under § 1983 may not be premised on a *respondeat superior* theory; a municipality may be held liable under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy inflicts . . . injury").

## 2.   CITY OF CHICAGO

Plaintiff's *Monell* claim against the City of Chicago, much like her *Monell* claim against Will County Sheriff Kaupas. is conclusory and does not include any allegations about similar incidents or complaints. *See* R. 62 at 15, ¶¶ 84-87 (alleging that the City of Chicago "maintained policies or customs exhibiting deliberate indifference to the constitutional rights" of others; that "[i]t was the policy and/or custom of Chicago to inadequately and improperly investigate citizen complaints of police misconduct, and acts of misconduct were instead tolerated"; and that "[i]t was the policy and/or custom of Chicago to inadequately supervise and train" its officers and to "condone and facilitate . . . an environment . . . in which officers fail to report or investigate misconduct committed by other officers"). Nevertheless, the Court considers two additional sources of support for Plaintiff's *Monell* claim against the City of Chicago, which are not applicable to Plaintiff's *Monell* claim against Sheriff Kaupas.

The first source is allegations in the complaint against Officer Maas and Detective Callaghan. *See Karney v. City of Naperville*, 2016 WL 6082354, at *13 (N.D. Ill. Oct. 18, 2016) ("on a Rule 12(b)(6) motion to dismiss, the inquiry is limited to whether the plaintiff has pled sufficient factual content—whether it is other complaints or incidents, *the specific facts of the plaintiff's case*, some other evidence, or a combination of some or all of those things—that renders plausible the plaintiff's conclusion that there is an informal practice or custom for which the municipality may be held liable") (emphasis added). For instance, in *Sanders v. City of Chicago*

*Heights*, 2016 WL 2866097 (N.D. Ill. May 17, 2016), the court held that the plaintiff had presented sufficient evidence to survive summary judgment on a *Monell* claim against the municipality based on evidence concerning the actions of the individual officers. *See id.* at \*11 (*Monell* claim upheld where the evidence showed that the "Defendant Officers violated his right to due process when Defendants withheld material exculpatory and impeachment evidence, employed unduly suggestive identification procedures to induce Armstrong's false identification, and fabricated evidence in an effort to frame him"). Unlike the allegations against Sheriff Kaupas, the factual allegations regarding a police cover-up involving at least two Chicago police officers at different times and places (Officer Maas, at the scene of the incident, and Detective Callaghan, a few days later when Plaintiff went to the station to file a criminal complaint against the person who assaulted her) nudge Plaintiff's *Monell* claim against the City of Chicago slightly closer to the pleading threshold of plausibly suggesting the existence of an informal policy or custom by which acts of misconduct of other law enforcement officers (Griebel) could be said to be tolerated. The two Chicago police officers in question are alleged to have intentionally misled Plaintiff with the joint purpose of thwarting Plaintiff's efforts to discover the identity of the officer who assaulted her, falsified information on a police report, and made threats of pursuing a criminal prosecution against Plaintiff if she continued her efforts. At least one district court appears to have found somewhat similar conspiracy allegations sufficient to state a *Monell* claim. *See Thomas,* 178 F. Supp. 3d at 653 (denying motion to dismiss *Monell* claim "[b]ecause

Plaintiff has sufficiently alleged her access to courts claim under *Iqbal* and *Twombly*"). But in *Thomas* the plaintiff made allegations of a police cover-up that may have involved the Chief of Police. This Court is not convinced that the involvement of the two police officers here is sufficient to implicate the City of Chicago as an entity.

The second source of support for Plaintiff's *Monell* claim against the City of Chicago is found in *LaPorta*, 102 F. Supp. 3d at 1020-21. In that case, the court held that the plaintiff's *Monell* allegations of a widespread practice in the Chicago Police Department of "failing to investigate, discipline, or otherwise hold accountable its police officers" to be plausible where the plaintiff had alleged that "complaint registers" and "repeater lists" made publicly available by order of the Illinois appellate court "revealed that officer misconduct was prevalent within the CPD, but largely condoned, and to the extent possible, hidden from the public." *Id.* This information, however, is not specific enough for the Court to conclude that the type of police misconduct referenced in the *LaPorta* case (as shown in the publicly released complaint registers and repeater lists), is sufficiently similar to the allegations of police misconduct at issue here. The police misconduct of the City of Chicago Police Department alluded to in *Cheatham* is similarly not specific enough for the Court to conclude that it involves the same type of misconduct at issue here. *See* 2016 WL 6217091, at *6 (pleading of *Monell* claim upheld where the plaintiff "alleged that, prior to February 22, 2015, the City of Chicago was aware of several complaints of police misconduct involving the use of excessive force and numerous

claims of constitutional violations involving [the defendant police officer] specifically. Plaintiff also alleges that the City inadequately and improperly investigated citizen complaints of police misconduct and instead tolerated that misconduct. The allegations that the City knew about, failed to properly investigate, and tolerated misconduct raises a plausible claim that the City was deliberately indifferent through a policy or custom of inadequately training, supervising, and disciplining police officers.").

Accordingly, the Court finds that the inference of a municipal unofficial policy or custom in this case is too weak based solely on the allegations of the current complaint, which do not involve allegations of other similar complaints or incidents. The Court cannot plausibly infer from the complaint that the actions of the defendant police officers are attributable to an informal policy or custom of the City of Chicago arising out of its deliberate indifference to similar events. *See Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029-30 (7th Cir. 2006). For this reason, the Court concludes that Plaintiff's *Monell* claim against the City of Chicago must be dismissed.

## CONCLUSION

For the forgoing reasons, (1) the City of Chicago Defendants' motion to dismiss, R. 90, is granted in part and denied in part; (2) Defendant Griebel's motion to dismiss, R. 98, is denied; and (3) the motion to dismiss filed by Will County and Will County Sheriff Paul Kaupas, R. 100, is granted in part and denied in part, as follows:

The claims against Will County in Counts VI, VII, and IX of the First Amended Complaint are dismissed with prejudice.

Sheriff Kaupas is substituted in his official capacity in the place of Will County in Counts VI and VII of the First Amended Complaint.

Plaintiff's *Monell* claims against Will County Sheriff Kaupas and the City of Chicago in Counts IX and X of the First Amended Complaint are dismissed without prejudice.

In all other respects, Defendants' motions to dismiss are denied.

Plaintiff may file a motion to amend her *Monell* claims if she does so on or before March 15, 2017. The motion should attach a proposed amendment and a brief of no more than five pages explaining how the proposed amendment cures the deficiencies in the current *Monell* claims. Defendants should not file a brief responding to Plaintiff's motion to amend (should she choose to file one) unless the Court requests a response.

ENTERED:

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: February 24, 2017