IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WHITLEY KLINGLER, | ) | |
| | ) | |
| Plaintiff, | ) | 15-CV-1609 |
| | ) | |
| v. | ) | Thomas M. Durkin |
| | ) | |
| CITY OF CHICAGO; MAYASOL LLC, d/b/a | ) | |
| MCDONALD'S; CHICAGO POLICE OFFICER | ) | |
| MAAS (Star # 5237); CHICAGO POLICE | ) | |
| DETECTIVE JOHN E. CALLAGHAN | ) | |
| (Star # 20933); COMMANDER VOULGARIS | ) | |
| (Star #___); OFFICER BRANNIGAN (Star # 1593); | ) | |
| COUNTY OF WILL; SHERIFF OF WILL COUNTY | ) | |
| PAUL KAUPAS; and WILL COUNTY SHERIFF'S | ) | |
| DEPUTY MATTHEW GRIEBEL (ID # 01-913), | ) | |
| | ) | |
| Defendants | ) | |

## MEMORANDUM OPINION AND ORDER

The City of Chicago has filed a partial motion to dismiss Plaintiff's Second Amended Complaint. R. 141. The Court's prior ruling on the City of Chicago's motion to dismiss the First Amended Complaint is found at *Klinger[1] v. City of Chicago*, 2017 WL 736895 (N.D. Ill. Feb. 24, 2017). Familiarity with that ruling and the underlying facts of the case is presumed.

## DISCUSSION

**A.** ***Monell* Claim**

Primarily at issue is whether Plaintiff has succeeded in her second attempt to allege a *Monell* claim against the City. Pursuant to *Monell,* the City may be held

---

[1] Plaintiff's name is spelled incorrectly in the Court's previous order. The correct spelling is "Klingler."

liable under § 1983 only if a municipal policy caused the alleged constitutional violation. "[A] plaintiff may demonstrate the existence of an official policy in one of three ways: (1) proof of an express policy causing the loss; (2) a widespread practice constituting custom or usage that caused the loss; or (3) causation of the loss by a person with final policymaking authority." *Kujawski v. Bd. of Comm'rs of Bartholomew Cnty. Ind.*, 183 F.3d 734, 737 (7th Cir. 1999).

### 1. Official With Final Policymaking Authority

On the Court's original ruling on the *Monell* claim, Plaintiff relied solely on the second type of *Monell* claim—"a widespread practice constituting custom or usage." But in her Second Amended Complaint, Plaintiff has added allegations with respect to the third type of *Monell* claim of a loss occasioned by a person with final policymaking authority. Plaintiff now asserts that a newly named defendant, Watch Commander Valgouris, is a person with final policymaking authority whose actions caused her loss.

There are two problems with this new *Monell* theory. First, the only allegations of any conduct by Valgouris are that he was on duty the night of the incident and that he summoned Officer Brannigan to the scene. Paragraph 84 of the Second Amended Complaint then goes on to allege that Officers Brannigan and Maas acted pursuant to the directives of Commander Valgouris when they failed to properly obtain the suspect officer's name and when they let him leave the scene. But the only facts alleged to support the conclusory factual allegation that Commander Valgouris directed Brannigan and Maas to engage in the cover-up are

2

that he was the Watch Commander and that he sent Brannigan to the scene. To infer from these two facts that Valgouris directed the cover-up is implausible.

Second, even if the allegations regarding Valgouris plausibly suggest actual direction of the alleged cover-up, the allegation that he was the Watch Commander does not plausibly suggest that he was an official with final policymaking authority. To fit within the third category of *Monell* claims, the employee must be responsible for establishing final government policy in a particular area or on a particular issue. *See Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 675-76 (7th Cir. 2009) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986)). The allegation that a watch commander has final policymaking authority on the issue of how an incident is investigated, such as who to interview, what information to obtain, and how to report the information obtained from an investigation, simply is not plausible. A "watch commander" is commonly understood to be someone who is in charge of a particular area during a particular shift. The Court takes judicial notice that the duties of a Watch Operations Lieutenant of the Chicago Police Department is consistent with this common understanding. The Watch Operations Lieutenant is responsible for "personally *oversee[ing], manag[ing], and direct[ing]* the operations of a watch, including response and crime prevention strategies, *consistent with* plans and strategies *established by the executive officer and district commander.*" Special Order S03-030-03, Chicago Police Department (emphasis added).[2] In other words, the Watch Operations Lieutenant's job is to supervise and direct all police

---

[2] Available at *http://directives.chicagopolice.org/directives/*.

activity in a given time period when he is on "watch" to make sure officers under his direction follow the rules; he is not making the rules.

Further, while a person can be an official policymaker in practice, even if not formally in title, *see, e.g., Mitran v. Cnty. of Dupage,* 946 F.2d 897, 1991 WL 209656 at *4 (7th Cir. 1991) (unpublished) (lower level official may be deemed to have final policymaking authority where decision-making is delegated to him without any and review by a higher authority), there are no factual allegations from which the Court can plausibly infer that policymaking authority was delegated to Commander Valgouris without being subject to review and/or override by his superiors in the police department. Thus, the Court concludes that the allegations regarding Commander Valgouris do not save Plaintiff's *Monell* claim.

### 2. Widespread Practice Constituting A Custom or Usage

In ruling on the City's first motion to dismiss, the Court held that Plaintiff's *Monell* claim against the City was legally insufficient because it was conclusory and failed to include any allegations about similar incidents or complaints. *See* R. 129 at 47-50. The new allegations in the Second Amended Complaint similarly contain many conclusory assertions of a "widespread practice" or "policy or custom." Moreover, while there is some attempt to reference past complaints against the two main officers involved, no details are given about those complaints to make the allegation of similar incidents or complaints plausible. The Court thus does not rely here on these allegations, which simply list the elements of a *Monell* claim in

conclusory fashion and as a result are not sufficient by themselves to survive Rule 12(b)(6) dismissal.

Nevertheless, the Court must conclude that the amended *Monell* claim is sufficient for purposes of Rule 12(b)(6) for a different reason. Beyond her generic *Monell* allegations, Plaintiff pleads other facts that make it plausible this was not an isolated incident. In its first ruling, the Court noted that in some cases the specific facts of the case at hand may be enough to render the plaintiff's *Monell* claim plausible without the need to allege similar incidents or complaints. *See* R. 129 at 48-49. Ultimately, however, the Court concluded that the involvement of the two police officers, Mass and Callaghan, were not sufficient. But now Plaintiff has added a third police officer who allegedly was involved in the cover-up, Officer Brannigan. Brannigan is the officer who allegedly wrote the fictitious name "O'Dublin" on the incident report. Further, Plaintiff has since learned that the IPRA interviewed members of the Emerald Society on the very evening that the incident took place and discovered from those individuals that the officer who assaulted Plaintiff was a Will County Sheriff's Deputy named Matthew Griebel. This raises the question of why Callaghan refused Plaintiff's request when she met with him a day or so after the incident to investigate the officer responsible for the assault, or, at the very least look into his identity and provide Plaintiff with that information. It is plausible given the results of the IPRA investigation that had Callaghan looked into the alleged assailant's identity, he would have discovered it. Callaghan was the detective assigned to investigate the incident, and therefore he was acting

5

independently of the officers who were on the scene of the incident days earlier. And why would he *not* have informed Plaintiff of Griebel's identify if he could have discovered it and there was no "code of silence" to protect fellow officers?

This Court recently found that a plaintiff had alleged an adequate *Monell* claim despite basing his claim solely on the events at issue in the case. As this Court explained:

> The challenge in litigation like this is to distinguish between systemic problems showing official deliberate indifference and occasional lapses that are inevitable even in well-run institutions. And while it may be helpful to establishing a widespread custom or practice to show that other inmates suffered similar constitutional injuries, no such showing is required.

*Bradford v. City of Chicago*, 2017 WL 2080391, at *4 (N.D. Ill. May 15, 2017) (internal quotation marks and citations omitted). The Court quoted in support from a Seventh Circuit case, *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917 (7th Cir. 2004), which stated that "[e]vidence of a single violation of federal rights can trigger municipal liability if the violation was a highly predicable consequence of the municipality's failure to act." *Id.* at 929 (internal quotation marks and citation omitted). Among the matters relied on by the *Woodward* court in finding that a single incident was sufficient for a *Monell* claim was the plausibility of the allegation that the incident in question suggested "a culture that permitted and condoned violations of policies that were designed to protect inmates like [the plaintiff]." *Id.* at 929 (internal quotation marks and citations omitted). While both *Bradford* and *Woodward* involved deliberate indifference claims in the prison

6

setting, the reference in *Woodward* to "a culture that permitted and condoned" constitutional violations is applicable here. And although a conclusory allegation of such a culture might not be sufficient, an allegation of such a culture that the facts support would not be. The facts here—including allegations of the involvement of at least three police officers who interacted with Plaintiff and/or the alleged assailant at separate points in time and yet all acted consistently with the alleged culture, as well as the fact that Griebel's true identity was actually known to the IPRA investigators within 24 hours of the incident yet Plaintiff repeatedly was told by Callaghan that the assailant's name was O'Dublin—is sufficient to support a plausible claim that such a culture exists, notwithstanding that Plaintiff has not alleged other similar incidents or complaints.

The Court acknowledges that the Seventh Circuit recently held in *Gill v. City of Milwaukee*, 850 F.3d 335 (7th Cir. 2017), that "the specific actions of the detectives" in that case alone, without more, could not sustain a *Monell* claim based on the theory of a *de facto* policy. While the Court, of course, agrees with that proposition insofar as the specific actions in question in that case are concerned, *Gill* does not preclude an examination of the officer conduct at issue in each case to see whether a widespread practice constituting a custom or usage is plausible given that conduct. Whereas in *Gill* such an inference was not plausible, Judge Tharp in *Listenbee v. City of Harvey*, 2013 WL 5567552, at *3 (N.D. Ill. Oct. 9, 2013), did infer from the facts in that case alone that the incident at issue "was not purely a 'random event' but rather the product of the City's adoption of a *de facto* policy of

7

tolerating the use of excessive force." Specifically, Judge Tharp relied on the factual allegations in that case of

> a brutal, unprovoked attack that began just outside the police headquarters, suggesting that [the defendant officer] made no attempt to avoid detection and had no expectation of negative reaction by superiors or other police officers. Likewise, the severity and readily observable placement of [the plaintiff's] injuries—particularly the profuse bleeding from his head—permit an inference, at this stage, that [the defendant officer] had nothing to fear by severely injuring an individual who was not even an arrestee at the time of the attack.

*Id.*

Although this is a close case, the Court concludes that it is closer on the facts to *Listenbee* than it is to *Gill*. Moreover, the Court takes judicial notice that there have been other complaints regarding a widespread practice in the Chicago Police Department of protecting fellow officers from charges of police misconduct or wrongdoing by police officers, even though Plaintiff has not specifically alleged any. For instance, in *Obrycka v. City of Chicago*, 2012 WL 601810 (N.D. Ill. Feb. 23, 2012), Judge St. Eve denied summary judgment on a *Monell* claim where the plaintiff had presented evidence that the City "has a well-settled, widespread practice or custom of impeding and interfering with police misconduct investigations," and that "there is an attendant 'code of silence' that exists within the Chicago Police Department whereby officers conceal each other's misconduct in contravention of their sworn duties." *Id.* at *6. In allegations similar to those made here, the plaintiff in *Obrycka* maintained that "this *de facto* policy and the code of silence are evidenced and caused by the Chicago Police Department's failure to: (1) sufficiently investigate allegations of police misconduct; (2) accept citizen

8

complaints against police officers; (3) promptly interview suspected officers or take witness statements and preserve evidence; (4) properly and sufficiently discipline officers; and (5) maintain accurate and complete records of complaints and investigations of misconduct." *Id.* After a jury returned a verdict in favor of the plaintiff on her *Monell* claim, the parties settled the case and the City moved to the vacate the judgment. Noting that the City sought to vacate the judgment out of "what appear[ed] to be its fear of future *Monell* litigation," Judge St. Eve nonetheless declined, holding that it was not in the public's interest to do so. *Obrycka v. City of Chicago*, 913 F. Supp. 2d 598, 606 (N.D. Ill. 2012).

The Court does not need to decide whether the allegations and findings of a jury in a case like *Obrycka,* which took place several years ago, are sufficient to lend plausibility to *Monell* allegations of a police "code of silence" and cover-up relating to fellow officers' misconduct occurring, as in this case, several years later. Less than two months ago, several Chicago police officers were indicted on a conspiracy to cover-up misconduct by another Chicago police officer in the Laquan McDonald case.[3] Thus, similar complaints continue to be made against the City. *See also LaPorta v. City of Chicago*, 102 F. Supp. 3d 1014, 1021 (N.D. Ill. 2015) (*Monell* claim upheld based on single incident where the plaintiff alleged "practices including: (1) concealing officer misconduct, (2) applying lenient standards to complaints against off-duty officers, (3) failing to maintain accurate records of officer misconduct, (4) hiring and retaining unqualified officers, and (5) permitting a 'code of silence' within

---

[3] *See* "Three Chicago cops indicted in alleged cover-up of Laquan McDonald shooting details," CHICAGO TRIBUNE, June 28, 2017.

9

the CPD."). In short, even though Plaintiff has failed to allege similar incidents or complaints of a police cover-up of fellow officer misconduct, the Court cannot bury its head in the sand to the fact that other incidents and/or complaints (and, indeed, at least one jury finding) in fact exist. Therefore, the motion to dismiss the re-pled *Monell* claim is denied.

B. **Conspiracy Claim**

To state a claim for a conspiracy in violation of § 1983, a plaintiff must allege that "(1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participant[s] in joint activity with the State or its agents." *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003) (internal citations and quotations omitted). Similarly, to state a claim for civil conspiracy under Illinois law, a plaintiff must allege "(1) an agreement to accomplish by concerted action either an unlawful purpose or a lawful purpose by unlawful means; (2) a tortious act committed in furtherance of that agreement; and (3) an injury caused by the defendant." *Kovac v. Barron*, 6 N.E.3d 819, 839 (Ill. App. 2014). An agreement may be inferred from circumstantial evidence showing "that a meeting of the minds had occurred." *Hernandez v. Joliet Police Dep't,* 197 F.3d 256, 263 (7th Cir. 1999).

Plaintiff has alleged an agreement between the City, the IPRA, and individual officer defendants to cover-up Griebel's assault, and a specific act by the City in furtherance of that agreement. But the specific act attributed to the City in support of Plaintiff's conspiracy claim is that the City "continuously refused to turn

10

over requested discovery documents, including the IPRA report that names Griebel as the officer who assaulted Plaintiff." R. 136 (¶ 55). The Court cannot plausibly infer participation in a conspiracy based on a discovery dispute in the present case. Accordingly, the Court agrees with the City that Plaintiff's conspiracy claim against it in Count III of the Second Amended Complaint must be dismissed.

### C. Battery and Second Amendment Claims

The City also moves to dismiss the Battery and Second Amendment Claims against the City. Plaintiff states that she is withdrawing those claims. R. 143 at 12. Therefore, the City's motion to dismiss those claims is denied as moot.

## CONCLUSION

For the foregoing reasons, the City's motion to dismiss R. 141, is granted as to Count III and denied as to its remaining parts.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: August 8, 2017